VAN KAMPEN v THE DETROIT BANK & TRUST COMPANY

1. CORPORATIONS—STOCK REDEMPTION—IMPAIRMENT OF CAPITAL.

> A corporation is excused from redeeming its stock pursuant to a death redemption agreement upon the death of the principal stockholder where the purchase would seriously reduce the working capital of the company (MCLA 450.10[h]).

2. CORPORATIONS—STOCK REDEMPTION AGREEMENT—CONSTRUCTION OF CONTRACTS.

> An agreement between a corporation and its shareholders requiring the stock of the shareholders to be first offered to the corporation at book value before being sold to third parties will not be interpreted to require a further offer to the other stockholders if the corporation refuses the first offer where the agreement explicitly provides that if the corporation refuses the offer, the stock may be sold without further restriction.

Appeal from Wayne, Thomas J. Foley, J. Submitted Division 1 March 16, 1972, at Detroit. (Docket No. 9997.) Decided May 24, 1972.

Complaint by George Van Kampen against The Detroit Bank and Trust Company and Robert Martin, executors of the estate of F. H. Martin, the F. H. Martin Construction Company and others, for cancellation of *inter vivos* stock transfers and redemption of outstanding shares of F. H. Martin

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 18 Am Jur 2d, Corporations §§ 282, 285.
   Rights of creditors of corporation with respect to its purchase or acquisition of its own stock, 47 ALR 748.
[2] 18 Am Jur 2d, Corporations §§ 387, 388, 392.
   Construction and application of provisions of articles, bylaws, statutes, or agreements restricting alienation or transfer of corporate stock, 2 ALR2d 745.

Construction Company stock. Judgment for defendants. Plaintiff appeals. Affirmed.

*Kerr, Wattles & Russell,* for plaintiff.

*Miller, Canfield, Paddock & Stone* (by *George E. Bushnell, Jr.),* for defendants.

Before: R. B. BURNS, P. J., and HOLBROOK and QUINN, JJ.

HOLBROOK, J. The F. H. Martin Construction Company is engaged in the business of general contracting. At the outset of the company, F. H. Martin and his wife were the sole stockholders. In the late 1940's, B. H. Armiger joined the company. F. H. Martin suffered a heart attack in 1956. As a result of the infliction, he turned the management of the company over to Armiger and gave him 40% of the company's outstanding stock.

Plaintiff joined the company in June, 1951. Keith Manglos, F. H. Martin's son-in-law, joined the company in 1953.

On April 28, 1958, an offer made by Armiger to sell his stock interest in the company at book value was accepted by the company. The redemption of his 40% stock interest was consummated within 90 days thereafter. His shares were given the status of authorized and unissued shares of the company. Armiger resigned as an officer and director of the company concurrently with the redemption.

Plaintiff and Keith Manglos were each issued two shares of stock on February 1, 1958. On April 28, 1958, they were elected to the board of directors. Manglos was elected vice-president and secretary and plaintiff was elected second vice-presi-

dent. Plaintiff and Manglos respectively assumed responsibility for the field and office operations of the company.

On April 29, 1958, the company, F. H. Martin, Keith Manglos and plaintiff executed a stockholders' sales agreement. The agreement provided that, upon the death of any of the three individuals, the company will buy, and the decedent's estate must sell, his stock at book value, and if any of the three individuals desired to make an *inter vivos* transfer of the company stock, he must first offer such stock to the company at book value. At that date, F. H. Martin owned 416 shares and plaintiff and Keith Manglos each owned 2 shares of the company's 420 outstanding shares of stock.

In approximately 1962, F. H. Martin's son, Robert Martin, then an attorney in Grand Rapids, left the practice of law and joined the company. On November 29, 1962, he was elected to the board of directors.

In 1965, F. H. Martin learned that he suffered from cancer of the throat. Manglos became operating head of the company and plaintiff general superintendent. In the same year, the stockholders discussed a proposed trust voting agreement. This agreement was objected to by plaintiff and never came to fruition. At a meeting of the stockholders on April 9, 1965, F. H. Martin formally announced his intentions of selling two shares of stock to his son Robert Martin. Plaintiff, through his attorney, voiced opposition to the proposed sale. Plaintiff was thereafter not elected to the board of directors.

Immediately following the stockholders' meeting, a board of directors' meeting was held. The two shares of stock were offered to the company pursuant to the stockholders' sales agreement. The

company declined to purchase and the shares were thereafter sold to Robert Martin.

Plaintiff's employment was terminated on May 3, 1965, when he insisted that he had a vested right in 50% ownership of the company by virtue of his ownership of two shares of stock, apparently in anticipation of F. H. Martin's death, and when he refused to acknowledge the rights of F. H. Martin, as majority owner of stock, to dispose of two shares of his stock to his son, Robert Martin, pursuant to paragraph 2 of the stockholders' sales agreement.

On December 28, 1965, F. H. Martin offered 153 shares of stock to the company. The board of directors rejected the offered stock. The shares were thereafter transferred to various members of F. H. Martin's family.

F. H. Martin died March 25, 1966. The board of directors thereafter unanimously repudiated the provisions of the stockholders' sales agreement requiring immediate purchase of all of the stock in the estate of F. H. Martin. It was claimed that purchase of *all* the stock would have seriously reduced the working capital of the company and jeopardized its operations. However, the company did redeem 28 shares of stock from the estate on three separate occasions at one year intervals for a total of 84 of the 261 shares in the estate.

Plaintiff brought suit seeking (1) cancellation of the *inter vivos* stock transfers made by F. H. Martin to his son Robert Martin and various other members of his family, and (2) the redemption by the company of the outstanding shares of stock in the estate of F. H. Martin. From a judgment of no cause of action for the defendants, plaintiff appeals.

Plaintiff first contends that the stockholders'

sales agreement was breached by reason of the company's repudiation of the death redemption provision in paragraph 1 and the refusal to purchase the outstanding shares of stock from the estate of F. H. Martin. He contends that he is entitled to have the company redeem the shares in the estate.

Paragraph 1 of the agreement reads as follows:

"1. That in the event of the death of any of second parties, the first party will buy and it shall be incumbent upon the estate of any such deceased second party to sell, all of the stock of first party at such time outstanding in the name of such deceased. The price of sale shall be the book value as of the last day of the month immediately preceding date of death."

It is clear that the repudiation of the death redemption provisions and the refusal to purchase the outstanding shares of stock in the estate of F. H. Martin did breach the stockholders' sales agreement. However, in so doing, it is claimed by defendants that the board of directors was acting pursuant to law.

MCLA 450.10(h); MSA 21.10(h) provides:

"That no corporation shall use its funds or property for the purchase of its own shares of capital stock when such use would cause any impairment of the capital of the corporation."

The trial court specifically found that a purchase by the company of *all* of the stock in the F. H. Martin estate would have seriously reduced the working capital of the company and thus hindered the effective operation of the company. A review of the record reveals ample support for the findings of the trial court, and they are not clearly erroneous. GCR 1963, 517.1; *Darby v Monroe Bank &*

*Trust,* 30 Mich App 289 (1971). We hold, as did the trial court, that the purchase of all of the company's stock held by the estate would have impaired the capital of the company in violation of MCLA 450.10(h); MSA 21.10(h), and that therefore, the board of directors acted properly in refusing to jeopardize the financial position of the company.

Plaintiff's next contention concerns paragraph 2 of the stockholders' sales agreement. Plaintiff recognizes that paragraph 2 literally provides that if any of the second parties—F. H. Martin, Manglos or plaintiff—desired to make an *inter vivos* sale of stock, the company would have a first option to purchase this stock. However, he contends that, taken as a whole, the true intent of the agreement is that the company's right to reject under paragraph 2 is qualified so that only the second parties —F. H. Martin, Manglos or plaintiff—could purchase the stock if rejected by the company, and not any third parties. Plaintiff therefore contends that the refusal of the company to purchase the shares of stock offered to it by F. H. Martin during his lifetime and the subsequent transfer of this stock to various members of his family breached the stockholders' sales agreement.

The relevant portions of the agreement are as follows:

"Whereas the primary business of first party is the construction field, and is based almost entirely upon personal service and the personalities of the individuals engaged in it, and

"Whereas it is recognized that the success of first party, past, present and future, has rested and will continue to rest principally upon second parties, and

"Whereas it is deemed to the best interest of first party and essential to its survival, to insure continuity of second parties in positions of management and control of first party's operations, and that the stock of first

party not be allowed to get into the hands of third parties or made available to the public, and

"Whereas second parties constitute the owners of all of the outstanding stock of first party,

"Now, therefore, and for the purposes and reasons hereinbefore recited, it is agreed as follows:

\* \* \*

"2. It is further agreed that should any of the parties of the second part desire to sell any of their stock in first party, prior to death, first party shall have a first option thereon. All offers to sell shall be in writing, delivered to first party at its business address; first party shall have 30 days from receipt of offer within which to accept or reject. The purchase price shall be the book value determined and paid as hereinbefore in this agreement provided for sales in case of death. Should first party reject, the offered stock may be sold *without further restriction* and it shall be the duty of the secretary of first party to certify the fact of such release upon the subject certificates of stock." (Emphasis supplied.)

It is obvious that plaintiff's claimed interpretation of the agreement is incorrect. The terms of paragraph 2 indicate clearly that the parties contemplated the possibility of changes in the corporate ownership during their lifetime. Paragraph 2 explicitly states that if the company rejected an offer of stock, the offered stock may be sold by the second party *"without further restriction"*. (Emphasis supplied.) If the parties to the agreement intended that the agreement be given the interpretation of restriction on alienability of the stock that the plaintiff now asserts, they could have said so. However, they did not do so. Instead, they chose the restrictions explicitly stated in paragraph 2. We hold that paragraph 2 of the stockholders' sales agreement enabled F. H. Martin as a second party to transfer his stock to his son, Robert Martin, and other members of his family

after the company as first party had rejected his offers of stock first made to it.

Other claims by plaintiff need not be discussed because of our disposition of the foregoing issues.

Affirmed. Costs to defendants.

All concurred.